GASTON RABEL, Plaintiff, *against* GEORGE W. GRIFFIN *et al.*, Defendants.

[SPECIAL TERM.]

(Decided December 5th, 1883.)

G. & Co., having as factors of plaintiff sold a cargo of sugar on his ac- count, accepted his drafts at thirty days sight on them for the amount of the estimated price of the sugar, upon his promise to remit them a draft on the purchaser for the price at three days sight, so that they would be covered before the maturity of the thirty days acceptances. He remitted such draft to them, requesting them to have it collected to his credit in account, and, the sum not being equal to the amount of his drafts upon them, he promised to forward to them the amount over- drawn "in time to cover," and did accordingly forward to them a bank- er's draft for a sum exceeding somewhat that amount. *Held*, that the

proceeds of the drafts so remitted by him, received by G. & Co., were held by them in trust to be applied to the payment of his drafts accepted by them, and G. & Co. having paid but one of those drafts, and having afterwards made a general assignment for the benefit of their creditors, plaintiff was entitled, as against their assignee for benefit of creditors, to such part of the proceeds of his remittances as had not been so applied and could be traced.

In an action for the recovery by plaintiff of such proceeds, the complaint alleged that, at the time of the assignment by G. & Co. for the benefit of their creditors, there was on deposit in bank in their name a specified sum, part of said proceeds, and that the assignee had drawn said money from the bank, and deposited it with a certain banking house. The answer of the assignee admitted that the sum specified had come into his hands as part of the assets of G. & Co., and that he had deposited said sum with the banking house named; but, as to the other allegations of the complaint, denied any knowledge or information sufficient to form a belief. *Held*, that such denial did not extend to the allegation that he personally drew the moneys from the bank, that being a fact in regard to which he had personal knowledge, but related merely to the allegations of the complaint in regard to the origin of the funds.

The deposit of trust funds by a trustee in his own private bank account, in which he may have deposited moneys of his own or moneys which belonged to other *cestuis que trust*, does not so far destroy the identity of the funds that the *cestui que trust* becomes merely a general creditor.

In cases of such deposits of trust moneys with individual funds of the trustee, the rule that the moneys first drawn out are to be charged against the moneys first paid in does not apply; the drawer must be taken to have drawn out his own money, in preference to the trust money, in paying his general debts.

TRIAL of an action to recover from an assignee under a general assignment for the benefit of creditors, moneys alleged to have been held in trust by the assignors.

The plaintiff is a merchant at Cardenas, Cuba, and Griffin and Churchill, two of the defendants, were formerly engaged in business in New York as commission merchants under the name of G. W. Griffin & Co. In January, 1883, Griffin & Co. sold a cargo of sugar for account of the plaintiff to the Continental Sugar Refining Company of Boston. Plaintiff estimated that the invoice would amount to about $40,000, and wrote to Griffin & Co. that he would draw on them at thirty days sight for that amount on forwarding charter party, and would remit them a three days

sight draft for the amount of the invoice upon the Continental Sugar Refining Company, so that Griffin & Co. would be covered before the maturity of the thirty days drafts. To this Griffin & Co. assented. The drafts were drawn in several small amounts and were sold in Havana. They were all presented together and were accepted by Griffin & Co. On February 21st plaintiff forwarded to Griffin & Co. bill of lading and draft upon the Continental Sugar Refining Company for the amount of the invoice— $34,827.50—in a letter which is quoted in the following opinion.

The next day plaintiff sent a banker's draft for $5,600 to cover the difference between the amount of the invoice and the thirty days acceptances. Griffin & Co. collected the banker's draft and used the proceeds in their business. They procured the draft on the Continental Sugar Refining Company to be discounted at their bank, and were credited on March 6th with $20,000 and on March 7th with $14,827.50, the balance of the draft, less discount.

When they obtained the first credit on account of the draft on March 6th, they had a balance in bank of $371.23. They made no further deposit on that day. From March 7th to March 12th they deposited various sums of money to their credit. Between March 6th and March 12th they drew checks to an amount exceeding $40,000. The thirty days acceptances fell due March 11th; only one of them ($5,000) was paid, and on March 12th Griffin & Co. made an assignment for the benefit of creditors to the defendant Edward Earle. At the time of the assignment they had in bank upwards of $17,000. The thirty days protested acceptances were paid by Rabel.

Plaintiff brought this action alleging that the whole or the greater part of the balance in bank to the credit of Griffin & Co. at the date of their assignment consisted of the proceeds of the draft upon the Continental Sugar Refining Company, and that he was entitled to such proceeds in preference to the general creditors.

*E. R. Olcott* and *J. F. Mosher*, for plaintiff.

*John Reynolds*, for the assignee, defendant.

VAN BRUNT, J.—[After stating the facts as above.]—In disposing of the questions involved in this case, it seems to me entirely immaterial as to what the special origin of the forty thousand dollars in drafts was; that is, whether they were drawn by the plaintiff and accepted by the defendants Griffin & Co., purely as an accommodation to the plaintiff, or whether they were drawn and negotiated in connection with the charter party of the vessel which was to transport the sugars thereafter to be brought to Boston. And it seems to be entirely immaterial whether those drafts were negotiated upon the sole credit of the drawer or in connection with the charter party and any expectations which the purchaser of the drafts had that they would be accepted by Griffin & Co. in New York. In any event, the acceptance of the drafts was a loan of the credit of Griffin & Co. to the plaintiff, they relying upon his promise to put them in funds prior to the maturity of the drafts.

The question then arises as to the circumstances under which the proceeds of the cargo of sugar, which was sold by Griffin & Co. as the factors of the plaintiff, came into the hands of Griffin & Co. It is claimed upon the part of the defendants that it was the ordinary case of a transaction between a debtor and creditor; that the plaintiff was debited with the forty thousand dollars of drafts accepted by Griffin & Co., and he was credited upon the books of Griffin & Co. with the proceeds of the sales of the sugar, and the draft which the plaintiff forwarded for making up the deficiency between the proceeds of the sale of the sugar and the forty thousand dollars of accommodation drafts before mentioned. There would be no difficulty whatever, in my judgment, in coming to the conclusion that the drafts for $34,827.50, the proceeds of the sugar, and also the draft for $5,600, subsequently remitted, were sent by the plaintiff in this action to Griffin & Co. for the express purpose of taking

up the $40,000 of drafts which Griffin & Co. had accepted for the accommodation of the plaintiff, were it not for some expressions contained in the letter which incloses the draft of $34,827.50. The plaintiff in that letter, which bears date on the 21st of February, uses the following language :

" Inclosed please find shipping documents, your order in blank, of 603 hogsheads Mdo. sugar per Eugene Hale, invoice amount $34,827.50, sold to the Continental Sugar Refinery, Boston, against which we have drawn as per first of exchange herein inclosed, and to your order at 3 days, $34,827.50, which please have collected to our credit in account. We have placed to your credit one per cent. commission on same $34,827.50. The $5,172.50 overdrawn we will forward to you by next mail in time to cover."

It is claimed, with great force, by the counsel for the assignee herein, that this language shows that this money, when collected, was simply to be passed to the credit of the plaintiff herein, and, if the language of the letter alone is to be considered, that is certainly its import ; but the question arises whether that was the intention of the parties, or whether it was not the intention that this money should be held by Griffin & Co., together with the subsequent remittance which was promised in the letter, for the express purpose of paying the drafts of $40,000 which were subsequently to mature, and which Griffin & Co. had accepted for the accommodation of the plaintiff. It seems to me that the relation of the parties and the nature of the transaction would necessarily lead to this conclusion, and also the last paragraph quoted from the letter which has been referred to, of the 21st of February, seems to indicate that such at least was the intention of the plaintiff in this action. The remittance of the thirty-four thousand and odd dollars draft is referred to ; the fact that that draft will not pay the amount of the accommodation drafts which were about to fall due, and the commission of Griffin & Co. for acceptance, is recognized, and the plaintiff adds that " the deficiency will be forwarded to Griffin & Co. by next mail in time to cover," thus indicating that the remittances were made to Griffin & Co. for

the purpose of putting them in funds to meet these drafts, and for no other purpose. It is true that in the subsequent remittance the amount was $5,600 in a round sum and not exactly $5,172.50, the amount of the deficiency; but that circumstance does not seem to be of a character to change the relations of the parties. If it was the intention of the plaintiff in this action to remit these funds to Griffin & Co. for the purpose of enabling them to take up those drafts, and for no other purpose, then Griffin & Co. had no authority or right to use these funds for any purpose whatever, except that of meeting the $40,000 of drafts at their maturity. Under these circumstances, it does not seem to me that the particular wording of the letter in question can control or alter or change what was manifestly the intention of the parties to this action, and was certainly the intention of the plaintiff at the time that the remittances were made, and which the defendants Griffin & Co. undoubtedly well understood.

I am of the opinion, therefore, that the moneys as received by Griffin & Co. were clothed with the trust that they should be applied to the payment of these $40,000 of drafts, and that such part of said remittances as were not so applied, if they can be traced, belong to the plaintiff and not to the general estate of Griffin & Co.

It appears from the books of Griffin & Co. that these proceeds of sale and the draft for $5,600 were deposited to their individual credit in their bank, and the next question to discuss is whether these trust funds can be traced into the hands of the assignee; and in considering this proposition it is necessary to consider the condition of the pleadings.

It is claimed upon the part of the defendants that there is no evidence to show that the assignee received any of the money in bank of Griffin & Co. The allegation of the complaint is that on or about the 12th day of March, 1883, the said G. W. Griffin & Co. made an assignment in writing for the benefit of creditors to the defendant Edward Earle, who now claims to hold and possess all the money and other

property that stood in the name of said G. W. Griffin & Co. at the time of said assignment. The plaintiff then alleges, upon information and belief, that at the time of the assignment aforesaid there was on deposit in bank in the name of G. W. Griffin & Co., of the proceeds of the aforesaid draft on the Continental Sugar Refinery Company and of the proceeds of the aforesaid cargo of sugar, the sum of $17,235.62, or thereabouts, and that the defendant Edward Earle, assuming to act as assignee as aforesaid, has drawn said money from the bank where it was deposited, and has deposited it with the banking house of John H. Davis & Co., of the City of New York, where it now stands in the name of the said Edward Earle, as assignee.

The answer of the assignee admits so much of the foregoing paragraphs of said complaint as allege, in substance, that the sum of $17,235.62 in cash has come into the hands of the said assignee herein as a part of the assets of said G. W. Griffin & Co., and that the said assignee has deposited said sum with said banking house of John H. Davis & Co., where it now stands in the name of this defendant as assignee, as aforesaid. The answer then proceeds and states that as to all the other allegations of said complaint the said defendant, assignee, has no knowledge or information sufficient to form a belief, and he therefore denies the same, leaving the plaintiff to make such proof thereof as he may be advised. The allegation of the complaint is that the assignee drew from the bank these moneys.

The assignee admits the receipt of the moneys as part of the estate of G. W. Griffin & Co. He certainly did not intend by his denial upon information and belief to deny an allegation in the complaint that he personally drew those moneys from the bank, because that was a fact in regard to which he had knowledge, personal knowledge, and which he never could have intended to have denied upon information and belief. He nowhere intimates any denial as to having received the funds from the depository from which the plaintiff alleges it to have been derived, but the denials

would seem to relate entirely to the allegations of the complaint in regard to the origin of the funds. Therefore, for the purposes of this action, it seems to me that it must be held that the pleadings admit the drawing of the money by the assignee from the bank, as alleged in the complaint.

That the deposit of trust funds by a trustee in his own private bank account in which he may have deposited moneys of his own or moneys which belonged to other *cestuis que trust*, does not so far destroy the identity of the funds that the *cestui que trust* merely becomes a general creditor, is so well established by the courts of both this state and of England that it is not necessary to discuss the proposition (*Van Allen* v. *American Nat. Bank*, 52 N. Y. 1; *Pennell* v. *Deffell*, 4 De Gex, M. & G. 372; *In re Hallett's Estate*, 13 L. R. Ch. Div. 696). Therefore the plaintiff in this action is entitled to recover from the assignee such part of the funds of the plaintiff deposited by Griffin & Co. in their private bank account as can be traced. The extent to which the courts have gone in following the lien of *cestuis que trust* upon trust property, and upon that which has been substituted for trust property, is illustrated to a marked degree by the case of *Hooley* v. *Gieve*, reported in the Court of Appeals in 82 N. Y. 625, and in this court in 9 Daly 104. In the decision of the case in the Court of Appeals no opinion appears to have been written, but the decision of the General Term of this court was affirmed upon the opinions rendered by such General Term. The decision in that case was founded upon the following principles:

1. That the representatives of a deceased partner have a lien upon the whole of the assets of the firm, subject to the payment of the debts of the firm for the amount which may be found to be the deceased partner's share of the firm's assets.

2. That the surviving partner is entitled to the possession of the whole of the firm's assets for the purposes of liquidation, and he becomes a trustee for that purpose.

3. That if the surviving partner continues the business

Rabel *v.* Griffin.

of the firm, and uses the assets of the old firm in such continuation, he commits a breach of trust, and misappropriates property upon which a lien has been impressed for the security of the representatives of the deceased partner.

4. That if by such continuation the surviving partner has disposed of the assets and stock of the old firm and has invested the proceeds thereof in new stock, so that the identity of the old stock and assets is lost, and has mingled in such new stock property of his own in such manner that it cannot be separated, the court will impress the lien of the representatives of the deceased partner upon the whole of the new stock to indemnify the trust fund, except against a *bona fide* purchaser or a party having acquired a specific lien by the levy of an execution or attachment.

5. That such lien will be enforced to the exclusion of the individual creditors of the surviving partner, upon the ground that it would be more inequitable to appropriate any portion of the trust funds to the payment of the individual debts of the surviving partner than that some portion of his individual property, which he had so mingled with the trust funds that its identity was lost, should be appropriated to the indemnification of the trust fund. The surviving partner could give to the representatives of the deceased partner a mortgage or a bill of sale of the whole of his own estate to make good the trust fund to the exclusion of his individual creditors, and this is all the court does in enforcing this implied lien; but the surviving partner could not give a mortgage upon or a bill of sale of any portion of the substituted trust property to secure any of his creditors. " The court marshals the equities and gives a prior lien to the greatest."

It appearing, from the evidence in this case, that subsequent to the deposit of the moneys of the plaintiff in the bank by the defendants, Griffin & Co., they made various deposits and drew various checks against the account, it is necessary to determine the order in which the checks should be charged against the account.

It is claimed upon the part of the defendants that the

moneys drawn out are to be applied to the moneys first paid in. This is the rule which seems to have received the sanction of the court in *Pennell* v. *Deffell*, above referred to; but in the more recent case, *In re Hallett's Estate*, above referred to, an entirely different rule was adopted by the Court of Appeal; and it was held, after a review of all the authorities, that in the case of money deposited by a trustee to his individual account with his bankers, the rule that the first drawings out are to be attributed to the first payments in, does not apply, and that the drawer must be taken to have drawn out his own money in preference to the trust money; that the rule above referred to applies, however, in the case where the question is between two *cestuis que trust*. The case of *Pennell* v. *Deffell (supra)*, is referred to and expressly overruled; and that this is in consonance with justice and equity seems to be apparent, and is entirely consistent with the rules laid down in the case of *Hooley* v. *Gieve*, where the court protects the trust fund in preference to allowing any part of such fund to be devoted to paying the general debts of the defaulting trustee.

In making up their statements of the condition of the accounts by the respective counsel, a radical difference has been pursued in reference to the charges and credits contained in the account. Upon the one hand, where checks and credits appear upon the same day, the credit is given first and the checks deducted afterwards; in the other case, the checks are deducted first and the credit given afterwards. This makes a very vital difference in the results arrived at, and it is proper that the justness of the two courses should be examined.

There is nothing to show, as far as the point of time is concerned, whether these deposits were made first or whether the checks on a given day were drawn before the deposits were made. It appears, however, upon an examination of the check book, which was the book of original entry, that it was the habit, as far as checks were concerned, to charge them in account only when they were footed up at the bottom of each page of the check book, and that in every case

the deposit upon a given day seems to have been credited before any checks of that day were charged, with the exception of one check, dated March 9th, for $47.83, which seems to have been charged before any deposits were credited as being made upon that day. Therefore it is reasonable and just to credit all deposits made upon the account upon any given business day before charging any one of the checks; and, in view of the decision of the case of *Hallett's Estate* and also of the plain equity of such a method of procedure, all checks drawn for the individual business of the defendants should be charged against individual funds as far as such funds would pay such check at the end of the business day upon which the checks were drawn. Applying these principles to the account of the defendants Griffin & Co., it would appear that at the time of their failure there was a balance in their hands of $12,672.43 of trust funds which the plaintiff in this action is entitled to claim from the assignee.

Judgment accordingly.